# EXHIBIT   E

# COURT OF APPEAL

## SECOND APPELLATE DISTRICT
### Division Six

THE PEOPLE,

    Plaintiff and Appellant,

v.

MIGUEL ANGEL MOLINA,

    Defendant and Respondent.

2d Crim. No. B170538
(Super. Ct. No. CR13298)
(San Luis Obispo County)

COURT OF APPEAL - SECOND DIST.

F I L E D

JUL 2 2 2004

JOSEPH A. LANE, Clerk
Deputy Clerk

---

# O P I N I O N

---

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
JOSEPH A. LANE, CLERK

DIVISION 6

Superior Court of California, County of San Luis Obispo
County Govt. Center, Room 355
San Luis Obispo, CA 93408-2500

     In re MIGUEL MOLINA
     on
     Habeas Corpus
     B170538
     San Luis Obispo County No. CR13298

## *** REMITTITUR ***

    I, Joseph A. Lane, Clerk of the Court of Appeal of the State of California, for the Second Appellate District, do hereby certify that the attached is a true and correct copy of the original order, opinion or decision entered in the above-entitled cause on July 22, 2004 and that this order, opinion or decision has now become final.

Witness my hand and the seal of the Court
affixed at my office this     SEP 22 2004

Joseph A. Lane, Clerk

by: _____
     Deputy Clerk

cc:  All Counsel (w/out attachment)
     File

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b).  This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MIGUEL ANGEL MOLINA,<br><br>    Defendant and Respondent. | 2d Crim. No. B170538<br>(Super. Ct. No. CR13298)<br>(San Luis Obispo County) |

COURT OF APPEAL - SECOND DIST.

F I L E D

JUL 2 2 2004

JOSEPH A. LANE, Clerk
Deputy Clerk

      The People appeal a superior court order which granted a writ of habeas corpus, overturned the Governor's decision which denied Miguel Angel Molina parole and ordered him released from prison.  The Governor had reversed a Board of Prison Terms (BPT) decision which found Molina suitable for parole.  We conclude, among other things, that the trial court erred by granting the writ because there was evidence to support the Governor's findings that Molina was unsuitable for parole.  We reverse.

FACTS

      On December 5, 1984, Molina bought a .22 caliber rifle and went to the home of Ruben Morales, who was unarmed and sitting down watching television. Molina entered the home and killed Morales.  Dr. Stephen Jobst, a pathologist, determined that Morales "was shot a minimum of 15 times and a maximum of 18 times."

      Molina fled and was a fugitive for four months until his arrest.  After his arrest, Molina told detectives that Morales, a coemployee, had stabbed him at work.  He

said Morales and his friends thought he "was scared," but "he was not." Molina said, "I'm a tranquil guy and have nothing to worry about."

At the preliminary hearing, Dr. Jobst testified that after the first two shots Morales was still alive because the forensic evidence showed that he turned his body away from Molina before the third shot. He concluded that the last two shots were fired to Morales' face at a closer range than the others, less than two feet away. He said "death was not instantaneous" and Morales survived up to 60 seconds after the shooting.

Jose Romero testified that Molina and Morales had prior altercations, but Molina was not afraid of Morales. He said that during the shooting Morales raised his hands in a defensive position with his palms facing forward.

Molina pled no contest to second degree murder. (Pen. Code, §§ 187, 189.) He was sentenced to a state prison term of 15 years to life.

The 1985 probation report said Romero heard Molina threaten to kill Morales a month before the murder. It noted that Molina showed no signs of remorse. A supplemental report stated Molina "feels bad that the incident happened." It also said he "feels . . . he is not guilty of murder as the victim provoked" him.

On September 14, 2001, Stephen Brown, the deputy district attorney who prosecuted Molina, wrote to the BPT to oppose parole. He said the "offense was carried out in an especially cruel and callous manner" and was "calculated" and premeditated.

On September 25, 2002, the BPT found that Molina was suitable for parole and "would not pose [an] unreasonable risk of danger to society." It relied on a report from Dr. M. Carswell, who concluded that Molina's potential for violence was the same as an average citizen, and he had "no particular mental health treatment needs except abstinence from alcohol."

### The Governor's Decision

The Governor reversed the BPT. He found "Molina has made some gains" during his 18 years in prison. He obtained his "GED and completed vocational auto repair." "He has shown remorse for killing Mr. Morales." He "has had no serious disciplinaries, although he has had five minor disciplinaries, the most recent in 1990."

Relatives have offered to allow him to stay with them upon his release. But he found "these favorable factors are outweighed by the factors that show that Mr. Molina would pose an unreasonable risk of danger to society if released . . . ."

The Governor listed a series of aggravating factors. He found: 1) the crime involved planning and was "especially atrocious and more aggravated and violent than the minimum necessary to sustain a conviction for second degree murder"; 2) the "number of shots [Molina] fired into . . . Morales was clearly out of proportion to any threat . . .Morales could possibly have posed"; 3) Morales "posed no immediate threat to . . . Molina and was defenseless when shot"; 4) Molina fled showing "a lack of remorse"; 5) Molina did not have a "specific plan for obtaining a job [and] has failed to make realistic plans for release"; and 6) "as recently as 2001, an evaluator concluded that [Molina] would likely pose a moderate degree of risk to the community if released."

The Governor concluded "Molina needs to be consistently found to pose a low risk for a longer period of time before he is suitable for release."

### The Superior Court Habeas Writ

The trial court found that an evidentiary hearing was not necessary. It granted the writ based on "in chambers" review of the record and found no evidence to support the Governor's findings. We stayed the superior court order pending our review of this appeal. We have independently reviewed the record because the trial court made findings solely on documentary evidence and without an evidentiary hearing. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 (*Rosenkrantz*).)

### DISCUSSION

The People contend that the trial court erred because the Governor properly considered the parole suitability factors and his findings are supported by "some evidence." We agree.

A parole decision by the Governor must "be based upon the same factors the Board is required to consider." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 676.) Courts must use an "extremely deferential" standard to review the Governor's decision. (*Id.* at p. 679.) "[O]ur inquiry strictly is limited to whether some evidence supports the Governor's

3

[findings]." (*Ibid.*) "Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. . . .  The precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within [his] discretion . . . ." (*Id.* at p. 677.)

### I. *The Parole Factors*

The Governor must "engage in an individualized consideration of the factors concerning parole suitability . . . ." (*Rosenkrantz, supra,* 29 Cal.4th at p. 685.)  In *Rosenkrantz,* our Supreme Court upheld the Governor's decision to deny parole.  It noted he made findings on the severity of defendant's offense, his subsequent conduct, his acknowledgment of guilt, remorse, conduct in prison and whether he would pose a substantial risk of danger to society.  (*Id.* at pp. 672-674.)

Here the Governor made individual findings on these factors and reviewed Molina's rehabilitation efforts, family ties and vocational training.  He said he reviewed "the same factors considered by the Board."  He considered the appropriate factors. (*Rosenkrantz, supra,* 29 Cal.4th at p. 685; *In re Morrall* (2002) 102 Cal.App.4th 280, 300 (*Morrall*).)

### II. *Evidence to Support the Governor's Findings*

#### A. *The Severity of the Crime*

The Governor found that the severity of Molina's offense showed he was not suitable for parole.  The evidence supports this finding.

"A prisoner's crime constitutes a factor tending to demonstrate unsuitability for parole, where [he] committed the offense in an especially heinous, atrocious, or cruel manner. [Citation.]" (*Rosenkrantz, supra,* 29 Cal.4th at p. 678.)  "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. [Citations.]" (*Id.* at p. 682.)  The Governor "properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant. [Citation.]" (*Id.* at p. 683.)

4

In *Rosenkrantz*, our Supreme Court upheld the Governor's denial of parole for a model prisoner who was convicted of second degree murder. Rosenkrantz shot the victim 10 times after the victim insulted him. (*Rosenkrantz, supra*, 29 Cal.4th at p. 629.)

Here Molina shot Morales 15 to 18 times. Molina's crime was more violent than Rosenkrantz's and other second degree murders where courts have upheld the Governor's denial of parole. (*Morrall, supra*, 102 Cal.App.4th at p. 285 [defendant shot victim seven times]; *In re McClendon* (2003) 113 Cal.App.4th 315, 320 (*McClendon*) [defendant shot estranged wife, but gun jammed preventing him from shooting another round at male companion].)

Molina argues he had prior violent altercations with Morales who threatened his life. But Brown said those events were "a series of trivial and mutually antagonistic encounters" and Romero testified Molina was not afraid of Morales. The Governor found that Morales was "defenseless" and "posed no immediate threat." These findings are supported by the evidence that Morales was unarmed and sitting in his room watching television when Molina entered and shot him.

Molina contends that the Governor's findings that the offense was premeditated, "especially atrocious," and "beyond the minimum necessary to sustain a conviction for second degree murder," are not supported by the evidence. We disagree.

"'Premeditation and deliberation can occur in a brief interval. . . .'" (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.) "The method of killing alone" may provide evidence of premeditation. (*People v. Memro* (1995) 11 Cal.4th 786, 863-864.) A trier of fact may find premeditation where a defendant brings a gun to the scene and shoots an unarmed victim multiple times. (*People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192; *People v. Adcox* (1988) 47 Cal.3d 207, 240.) Where evidence shows premeditation, the Governor may find the crime is "disproportionately egregious as compared with other second degree murders." (*McClendon, supra*, 113 Cal.App.4th at p. 324.)

Here the probation report said Romero told a detective that Molina threatened to kill Morales a month before the murder. The trial court in the habeas proceeding did not find this to be credible. Romero did not testify about this threat at the

5

preliminary hearing. But the issue was not credibility, it was whether some evidence supports premeditation.

Yet, even without evidence of the threat, other evidence supports the Governor's findings. The October 2002 Life Prisoner Evaluation Report states the "offense appeared to be pre-meditated [*sic*]." Molina had prior "antagonistic encounters" with Morales. He bought the rifle "on the evening of the incident." He drove to Morales' home with it and looked "around the room" before shooting Morales. Death was not instantaneous. Morales survived 13 bullet wounds. Molina then moved closer and fired the last two shots into his head. The prosecutor said this was the "coup de grace."

The Governor could find that Molina's offense was more calculated and atrocious than second degree murder because it was similar to an execution-style first degree murder. (*McClendon, supra*, 113 Cal.App.4th at p. 324; *Rosenkrantz, supra*, 29 Cal.4th at p. 678; see also *Morrall, supra*, 102 Cal.App.4th at pp. 301-302.) He reasonably found Molina unsuitable for parole based on the severity of the offense. (*Rosenkrantz, supra*, at p. 679.)

B. *Remorse*

Molina contends that the Governor's findings that he lacked remorse because he fled is a non sequitur and inconsistent with the Governor's finding that Molina "has shown remorse for killing . . . Morales." But these findings involve different time periods. The Governor found Molina currently expresses remorse, but did not feel that way shortly after the offense. Molina's conduct at this earlier time was relevant. (Cal. Code Regs., tit. 15, § 2402.) Molina argues that one can flee and have remorse. But the Governor did not have to draw that inference. Unlike the defendant in *Rosenkrantz,* Molina did not surrender to the authorities. He was a fugitive for four months. The first probation report said Molina never expressed any remorse. The supplemental report notes he said he felt "bad." But he also said he blamed the victim and was not guilty of murder. That was neither an acknowledgement of his guilt nor was it remorse.

6

### C. *Degree of Risk to the Community*

The Governor found Molina "posed a significant risk of danger to society if released on parole." Molina contends Dr. Carswell's report concluded that he posed a low risk of danger to the community. But the Governor is not bound by the evidence favorable to Molina and may resolve evidentiary conflicts against him. (*Rosenkrantz, supra*, 29 Cal.4th at p. 677; *Morrall, supra*, 102 Cal.App.4th at pp. 303-304 [Governor properly reduced the weight given to the positive conclusions in psychological evaluations and relied on the negative parts of those reports].)

Here the Governor noted that there was conflicting evidence about the degree of risk. Brown said past psychological evaluations submitted to the BPT had varying risk evaluations from "'low,'" to "'moderate,'" to "'unpredictable.'" A 2001 Prisoner Evaluation Report said "Molina would pose a moderate degree of threat to the public if released" and recommended continued alcoholism counseling. Dr. Carswell said Molina had a "risk factor" for alcohol and Molina conceded that alcohol was a factor in his offense. The Governor reasonably found that "Molina needs to be consistently found to pose a low risk for a longer period of time before he is suitable for release."

### D. *Conduct in Prison*

Molina contends the Governor mischaracterized his disciplinary record to deny him parole. The Governor found Molina "has had no serious disciplinaries, although he has had five minor disciplinaries, the most recent in 1990." Molina argues that the five events were "Counseling Chronos" for "minor misconduct" which entails "no discipline." (Cal. Code Regs., tit. 15, §§ 3000, 3312, subd. (a)(2).)

But even so, the Governor did not deny Molina parole based on his disciplinary record. He found his good prison conduct was outweighed by such factors as the seriousness of his offense. He was entitled to balance these factors in this manner. (*Rosenkrantz, supra*, 29 Cal.4th at p. 682 ["discipline free" prison conduct outweighed by gravity of offense].)

7

E. *Rehabilitation*

Molina contends the Governor's findings that he did not have a "specific plan for obtaining a job" and "has failed to make realistic plans for his release" are without evidentiary support. We disagree.

Molina submitted a letter from Antonio Alvarez, a California automobile repair shop owner. He offered Molina a job at $15 per hour when he is released. But a parole investigator was unable to confirm Alvarez's offer. He called the repair shop, but Alvarez was not in. Subsequently, Alvarez's brother informed the investigator that Alvarez "did not recall this matter."

Moreover, the offer was conditioned upon Molina presenting "evidence of legal Immigration Status." But at the parole hearing, Molina conceded that he is subject to an "INS hold" and would "likely be deported" because he unlawfully entered the United States. Therefore, upon his release, he would be unable to work in this country.

At the parole hearing, Molina noted that relatives in California offered to let him stay in their homes upon his release. But the Governor could reasonably infer those offers were not realistic because of Molina's immigration status.

The judgment is reversed.

<u>NOT TO BE PUBLISHED.</u>

GILBERT, P.J.

We concur:

YEGAN, J.

PERREN, J.

8

Michael L. Duffy, Judge

Superior Court County of San Luis Obispo

---

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Frances T. Grunder, Senior Assistant Attorney General, Julie L. Garland, Supervising Deputy Attorney General, and Nicholas N. Paul, Deputy Attorney General, for Plaintiff and Appellant.

Frank J. Pentangelo, under appointment by the Court of Appeal, for Defendant and Respondent.

9